

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| JOHN RUCKER, CAROLYN WILLIAMS, WANDA ANDERSON, MELANIE HOUSE, AND THOMAS R. PRINCE, JR., on behalf of themselves and others similarly situated.<br>       **Plaintiffs,**<br><br>  vs.<br><br>OASIS LEGAL FINANCE, L.L.C.; GLOBAL FINANCIAL CREDIT, L.L.C.; USCLAIMS; BLUE OCEAN PARTNERS, L.L.C., d/b/a PLAINTIFF SUPPORT SERVICES; and CAMBRIDGE MANAGEMENT GROUP, L.L.C.,<br>       **Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  **CASE NO.: 09-CV-00432** |

## DEFENDANT OASIS LEGAL FINANCE, L.L.C.'S COMBINED REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS FOR IMPROPER VENUE AND RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Defendant Oasis Legal Finance, L.L.C. ("Oasis") files this Reply Brief in Support of its Motion to Dismiss for Improper Venue and Response to Plaintiffs' Motion for Summary Judgment.

### Introduction

Plaintiffs John Rucker ("Rucker"), Wanda Anderson ("Anderson"), and Thomas R. Prince, Jr. ("Prince") agreed "to submit to the exclusive jurisdiction of the Circuit Court of Cook County, Illinois for any disputes, claims or other proceedings arising out of or relating to" the Purchase Agreements. Purchase Agreements, ¶ 8.11. Plaintiffs do not challenge the validity of this forum-selection clause. Rather, in response to Oasis's Motion to Dismiss based on the forum-selection clause, Plaintiffs filed a Motion for Summary Judgment arguing that the Purchase Agreements they each entered into with Oasis, while represented by counsel of their

own choosing, as a whole are "void *ab initio*" as illegal gambling contracts.  *See* Pls.' Br. at 1-2.

Plaintiffs ignore well-grounded federal precedent holding that the overall validity of a contract

containing a forum-selection clause must be determined by the contractually agreed upon forum

-- in this case, the Circuit Court of Cook County.  Otherwise, forum-selection clauses  would be

meaningless.  In short, Plaintiffs' Motion for Summary Judgment should be denied as premature

because it seeks to put the proverbial cart before the horse.

      Oasis's Motion to Dismiss for Improper Venue should be granted because Plaintiffs fail

to provide any factual or legal basis for this Court to refuse to enforce the Purchase Agreements'

forum-selection clause.  Plaintiffs completely ignore the four factors set forth by well-established

United States Supreme Court precedent for determining whether to enforce a forum-selection

clause.  To the extent Plaintiffs are relying on the "inconvenience" factor, they fall woefully

short of carrying their "heavy burden" of proving they will be "deprived of their day in court" if

the case is litigated in Cook County, Illinois.  Indeed, they fail to provide any evidence of

inconvenience whatsoever.  To the extent Plaintiffs are relying on the "public policy" factor,

Plaintiffs fail to show that Alabama has a strong public policy that its gambling statutes should

be adjudicated in Alabama and nowhere else.  Indeed, Plaintiffs fail to cite to a single Alabama

statute or judicial opinion that even remotely supports such a public policy.  Accordingly,

Oasis's Motion to Dismiss for Improper Venue should be granted, and Plaintiffs' Motion for

Summary Judgment should be denied as moot.

      Finally, should this Court choose to reach the merits of Plaintiffs' Motion for Summary

Judgment, the Court should deny Plaintiffs' Motion.  Plaintiffs fail to provide any evidence

whatsoever in support of their Motion, base their entire legal argument on a single decision from

the Alabama Court of Civil Appeals with facts that are easily distinguishable from this case,[1] and ignore the last Alabama Supreme Court decision addressing -- and, indeed, upholding -- legal funding agreements.[2]

## Facts

Oasis is a legal funding company that assists individual clients in obtaining non-recourse funding while they are pursuing personal injury cases.  Supplemental Affidavit of Michael Pekin ("Supp. Pekin Aff."), ¶ 3.  Oasis is currently engaged in the business of non-recourse legal funding in 48 states.  *Id.*  At least fifty other companies are also operating non-recourse legal funding businesses across the country.  *Id.*  At the time this action was filed, at least four other companies operated non-recourse legal funding businesses in the State of Alabama.  *Id.*, ¶ 4; *see also* Compl., ¶¶ 9-12.  No state currently considers non-recourse legal funding to be illegal for any reason.  Two states, Ohio and Maine, have expressly authorized non-recourse legal funding agreements through state legislation.  *See* Ohio Rev. Code Ann. §1349.55; Me. Rev. Stat. Ann. tit. 9-A, § 12-101 *et seq.*

In general, when a potential client approaches Oasis to obtain funding, Oasis investigates the client's legal claim to determine the merit of the client's claim and the appropriate amount to fund, if any.  Supp. Pekin Aff., ¶ 6.  If Oasis decides to provide funding, the client and Oasis will enter into a "Purchase Agreement," pursuant to which Oasis will purchase a potential interest in the proceeds of the client's personal injury case.  *Id.*  The amount of Oasis's potential interest in the proceeds of a client's personal injury case varies based on the amount Oasis initially funded and the length of time it takes the case to resolve.  *Id.*  Because Oasis does not purchase a **percentage** of the client's potential proceeds in his or her personal injury case, the dollar amount

---

[1] *Wilson v. Harris*, 688 So.2d 265 (Ala. Civ. App. 1996).

[2] *Lott v. Kees*, 165 So.2d 106 (Ala. 1964).

of Oasis's interest in the potential proceeds does not increase based upon the amount of money the client recovers in the personal injury case.  *Id.*

According to the Complaint, Rucker, Anderson, and Prince independently entered into separate Purchase Agreements[3] with Oasis.  Compl. ¶¶ 3, 5, & 6 & Ex. A, B, & C to Compl. Under the terms of each of the Purchase Agreements, Oasis paid each Plaintiff a "Purchase Price," which represents the initial amount funded to each Plaintiff, and in return each Plaintiff agreed to sell to Oasis a non-percentage interest in the proceeds of his or her personal injury case -- an interest that is characterized in the Purchase Agreements as the "Oasis Ownership Amount."[4]  Purchase Agreements at 1 & ¶¶ 1.2 & 1.5.  Under the terms of the Purchase Agreements, the Oasis Ownership Amount includes the Purchase Price, plus an additional sum that gradually increases over time based on an agreed upon payment schedule.  *Id.*, ¶ 1.2.  Should the circumstances warrant, Oasis does not always require clients to pay the full Oasis Ownership Amount.  For example, when Anderson repaid Oasis on November 17, 2008, she owed an Oasis Ownership Amount of $6,750.00.  Yet, Oasis accepted a reduced payment of only $4,058.96 from Anderson as payment in full.  Supp. Pekin Aff., ¶ 7.

Rucker, Anderson, and Prince were all separately represented by counsel at the time they signed the Purchase Agreements, and their attorneys each signed separate "Attorney Acknowledgement" forms.  Affidavit of Michael Pekin ("Pekin Aff."), attached as Exhibit 1 to Oasis's Motion, ¶¶ 4 to 6 & Ex. A, B & C, thereto.

The Purchase Agreements expressly provide that "Purchaser [Oasis] has imposed no conditions on Seller's [Rucker's, Anderson's, or Prince's] use of the Purchase Price.  Purchase

---

[3] Exhibits A, B, and C to Plaintiffs' Complaint are collectively referred to herein as the "Purchase Agreements" for ease of reference.

[4] Upon information and belief, Rucker has resolved his personal injury case.  Oasis has not received its Ownership Amount from Rucker.

Agreements, ¶ 3.3.  Oasis fully complied with Paragraph 3.3 of the Purchase Agreements and did

not impose any conditions on either Rucker's, Anderson's, or Prince's, use of the funding it

provided.  Supp. Pekin Aff., ¶ 8.

> Each of the Purchase Agreements also expressly provides:
>
> Purchaser [Oasis] acknowledges and agrees that Purchaser shall have no right to and will not make any decisions with respect to the conduct of the Legal Claim or any settlement or resolution thereof and that the right to make such decisions remains solely with Seller [Rucker, Anderson, or Prince] and Seller's Attorney.

Purchase Agreements, ¶ 4.1.  Oasis fully complied with this provision and never interfered in any

manner with Plaintiffs' personal injury cases.  Supp. Pekin Aff., ¶ 9.

> Finally, each of the Purchase Agreements has the same forum-selection clause, which

provides:

> The Parties hereby irrevocably and unconditionally consent to submit to the **exclusive jurisdiction of the Circuit Court of Cook County, Illinois** for any disputes, claims or other proceedings arising out of or relating to this Purchase Agreement, or the relationships that result from this Purchase Agreement, and **agree not to commence any such lawsuit, dispute, claim or other proceeding except in the Circuit Court of Cook County, Illinois.**  The parties hereby irrevocably and unconditionally waive any objection to the laying of venue of any lawsuit, dispute, claim or other proceeding arising out of or relating to this Purchase Agreement, or the relationships that result from this Purchase Agreement, in the Circuit Court of Cook County, Illinois, and hereby further irrevocably and unconditionally waive and agree not to plead or claim in the Circuit Court of Cook County, Illinois that any such lawsuit, dispute, claim or other proceeding brought in the Circuit Court of Cook County, Illinois has been brought in an inconvenient forum.

Purchase Agreements ¶ 8.11 (emphasis added).  In violation of this provision, Plaintiffs filed this

lawsuit in the United States District Court for the Northern District of Alabama.

### Argument

**I.      Oasis's Motion to Dismiss for Improper Venue must be decided prior to reaching the merits of Plaintiffs' Motion for Summary Judgment.**

Without citation to any authority whatsoever, Plaintiffs argue that Oasis's Motion to

Dismiss is "moot" because, according to Plaintiffs, the Purchase Agreements they each entered into with Oasis, while represented by counsel of their own choosing, are "void *ab initio*."  *See* Pls.' Br. at 1-2.  Plaintiffs' failure to cite any authority in support of this argument is not surprising because federal cases addressing this exact argument have rejected it outright.  Federal courts consider a forum-selection clause to be a separate agreement, the validity of which is not a function of the validity of the agreement in which it is included.[5]  The overall validity of a contract containing a forum-selection clause must be determined by the contractually agreed upon forum.  Otherwise, forum-selection clauses will become meaningless.

The case of *Muzumdar v. Wellness Int'l Network, Ltd.*, 438 F.3d 759, 762 (7th Cir. 2006), is directly on point and demonstrates the absurdity of Plaintiffs' argument.  The plaintiffs in *Muzumdar* entered into distributorship agreements with the defendant.  Each agreement included a forum-selection clause providing that "jurisdiction and venue over any disputes arising out of this agreement shall be proper only in the federal or state courts in Dallas County, Texas."  *Id.* at 761.  Similar to Plaintiffs in this case, the *Muzumdar* plaintiffs ignored the agreements' forum-selection clause, sued the defendant in the United States District Court for the Northern District of Illinois, and argued that the forum-selection clauses were inapplicable because the distributorship agreements were void against public policy.  The Seventh Circuit rejected the plaintiffs' argument and enforced the forum-selection clauses:

---

[5] Without citing any authority whatsoever, Plaintiffs argue that state law governs the enforceability of a forum-selection clause.  *See* Pls.' Br. at 9-10.  Plaintiffs' argument ignores well established Eleventh Circuit precedent holding that federal law, and not state law, governs the enforceability of a forum-selection clause.  *See, e.g., P & S Business Machines, Inc. v. Canon USA, Inc.*, 331 F.3d 804, 807 (11th Cir. 2003) ("Consideration of whether to enforce a forum-selection clause in a diversity case is governed by federal law."); *American Performance, Inc. v. Sanford*, 749 F. Supp. 1094, 1094 & 1097 (M.D. Ala. 1990) ("[F]ederal and not state law should apply and, under federal law, the forum-selection clause is valid and enforceable"); *Barnes v. FGL Clearwater, Inc.*, 397 B.R. 149, 153 (N.D. Ala. Bankr. 2008) ("Forum-selection clauses are enforceable in federal courts, and such enforcement is governed by federal law.")

Appellants also spend a good deal of time trying to convince us that because the contracts themselves are void and unenforceable as against public policy – i.e., they set out a pyramid scheme – the forum-selection clauses are also void.  The logical conclusion would be that the federal court in Illinois would first have to determine whether the contracts were void before they could decide whether, based on the forum-selection clauses, they should be considering the cases at all.  An absurdity would arise if the courts in Illinois determined the contracts were not void and that therefore, based on valid forum-selection clauses, the cases should be sent to Texas – for what?  A determination as to whether the contracts are void?

*Id.* at 762.

The Seventh Circuit's reasoning comports with the well established premise that a forum-selection clause is an agreement separate from, and independent of, the contract containing it and, therefore, the validity of a forum-selection clause is not a function of the validity of the contract in which it is included.  *Muzumdar*, 438 F.3d at 762 ("Appellants make no attempt to show that the forum-selection clause **itself** was obtained by fraud.") (emphasis added); *see also Breman v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972) (a forum-selection clause should be enforced unless plaintiff can "clearly show . . . the **clause** was invalid for such reasons as fraud or overreaching") (emphasis added); *Curran v. Radiaguard Int'l Inc.*, No. 05-1725, 2009 WL 276793, *14 n. 8 (D.P.R. Feb. 3, 2009)  ("[F]orum-selection clauses are deemed to be separate from, and independent of, the contract containing it.  Thus, if the forum-selection clause is not vitiated by fraud or otherwise unenforceable, then any other controversy related to the underlying contract must be entertained in the contractually designated forum."); *Nova Ribbon Prods., Inc. v. Lincoln Ribbon, Inc.*, No. 89-4340, 1992 WL 211544, *6 (E.D. Pa. Aug. 24, 1992) ("The forum-selection clause is a separate agreement, the validity of which is not a function of the agreement in which it is included.")

In an analogous situation, the Eleventh Circuit has held in numerous cases that arbitration provisions in arguably "void" contracts must be enforced and that the arbitrator, not the court,

should determine whether the contracts are void.  *See, e.g., Jenkins v. First Am. Cash Advance of Georgia, LLC*, 400 F.3d 868, 882 (11th Cir. 2005).  In *Jenkins*, the Eleventh Circuit explained:

> Jenkins argues the payday loan contracts are void, not because she failed to assent to the terms of the contracts, but because those terms render the contracts usurious and void under Georgia law.  Thus, Jenkins does not challenge the existence of either the payday loan contracts or the accompanying Arbitration Agreements; rather she challenges the content of the contracts -- *i.e.*, the rates of interest charged in the loan agreements. . . .  [W]e conclude Jenkins and Defendants entered into presumptively valid agreement[s] to arbitrate any disputes, including those about the validity of the underlying transaction. . . .  We conclude, therefore, that Jenkins' void *ab initio* argument, which challenges the legality of the payday lending transactions, is an issue for the arbitrator, not the court, to decide.

*Jenkins*, 400 F.3d 868, 882 (11th Cir. 2005) (quotations and citations omitted); *see also Bess v. Check Express*, 294 F.3d 1298, 1305-06 (11th Cir. 2002).

Even assuming *arguendo* that Alabama law did apply to this issue (and clearly it does not),[6] the result would be the same and the forum-selection clause should be enforced.  The Supreme Court of Alabama recently enforced an arbitration clause in an allegedly void gambling contract under the same reasoning as *Jenkins* and *Bess*.  *Johnson v. Jefferson County Racing Assoc., Inc.*, 1 So.3d 960, 965-966 (Ala. 2008) ("[T]he arbitration clause in the [MegaSweeps] contract between [JCRA] and [Johnson] is enforceable, and it is irrelevant whether [JCRA]'s actions render the contract as a whole void.") (*quoting Paragon Ltd., Inc. v. Boles*, 987 So.2d 561, 568 (Ala. 2007)).

In this case, Plaintiffs agreed "to submit to the exclusive jurisdiction of the Circuit Court of Cook County, Illinois for any disputes, claims or other proceedings arising out of or relating to" the Purchase Agreements and agreed "not to commence any such lawsuit, dispute, claim or other proceeding except in the Circuit Court of Cook County, Illinois."  Purchase Agreements, ¶ 8.11.  Plaintiffs do not challenge the existence or validity of Paragraph 8.11 itself.  Pursuant to

---

[6] As explained in footnote 4, *supra*, federal law governs the enforceability of forum selection clauses.

Paragraph 8.11, Plaintiffs agreed that the Circuit Court of Cook County, Illinois would be the only court to decide "any disputes," including those challenging the validity of the underlying transaction.  Thus, under the reasoning of *Muzumdar*, *Breman*, *Curran*, *Nova Ribbon*, *Jenkins*, and *Bess*, the overall validity of the Purchase Agreements should be decided by the contractually agreed upon forum, which in this case is the Circuit Court of Cook County, Illinois.

Accordingly, and because summary judgment would reach the merits of the underlying transactions and agreements (which the Circuit Court of Cook County is to decide), Oasis's Motion to Dismiss for Improper Venue should be decided before the Court reaches the merits of Plaintiffs' Motion for Summary Judgment.

## II.      Oasis's Motion to Dismiss for Improper Venue should be granted.

Plaintiffs fail to acknowledge or expressly address the four factors that federal courts are required to consider when determining whether "exceptional circumstances" exist to defeat a forum-selection clause.  *American Performance, Inc. v. Sanford*, 749 F. Supp. 1094, 1096 (M.D. Ala. 1990) ("Federal judge-made law generally favors the enforcement of choice-of-forum clauses, absent exceptional circumstances."); *see also M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972) (Forum-selection clauses "are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances."). Federal courts enforce forum-selection clauses, unless:  "(1) their formation was induced by fraud or overreaching; (2) the plaintiff effectively would be deprived of [his or her] day in court because of the inconvenience or unfairness of the chosen forum; (3) the fundamental unfairness of the chosen law would deprive the plaintiff of a remedy; or (4) enforcement of the provisions would contravene a strong public policy" (collectively, the "*Shute* factors").  *Lipcon*, 148 F.3d at 1292 (*citing Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 594-95 (1991)).  Plaintiffs fail to

expressly address a single *Shute* factor in their Brief.

Because Plaintiffs' Brief fails to expressly address any of the *Shute* factors, it is difficult to determine which of the factors, if any, they contend are applicable to this case.  It is clear that the first and third factors are not at issue because Plaintiffs do not mention "fraud" or "overreaching" and do not argue they will be "deprived of a remedy" if the case is litigated in Cook County, Illinois.  To the extent Plaintiffs are relying on the second factor, related to "inconvenience" or "unfairness," they fall woefully short of carrying their heavy burden of proving they will be deprived of their day in court if the case is litigated in Cook County, Illinois. To the extent Plaintiffs are relying on the fourth factor, "contraven[tion] of a strong public policy," Plaintiffs fail to show that Alabama has a strong public policy requiring that Alabama be the sole venue for any and all claims involving its gambling statutes.

Because Plaintiffs fail to prove any facts supporting the existence of any of the *Shute* factors with respect to the Purchase Agreements' forum-selection clause, Plaintiffs' Complaint should be dismissed without prejudice to allow them to re-file this action in the Circuit Court of Cook County, Illinois, where they should have filed their claims in the first instance.

      **A.**    **Plaintiffs fail to carry their "heavy burden" of proving they will be so gravely inconvenienced that they will be "deprived of their day in court" if their claims are litigated in the Circuit Court of Cook County, Illinois.**

Plaintiffs argue, without any evidentiary support whatsoever, that the forum-selection clause in the Purchase Agreements should not be enforced merely because Plaintiffs will be "seriously inconvenienced."  *See* Pls.' Br. at 11.  Plaintiffs' argument fails to acknowledge or meet the "heavy burden of proof" required to defeat a forum-selection clause based on inconvenience.  *Shute*, 499 U.S. at 592 & 595.  "A showing of mere inconvenience or greater expense does not satisfy the heavy burden a party bears in challenging a choice of forum clause."

*Samson Plastic Conduit & Pipe Corp. v. Battenfield Extrusionstechnik GMBH*, 718 F. Supp. 886, 891 (M.D. Ala. 1989).  Rather, in order to avoid a forum-selection clause based on inconvenience, "[t]he party opposing the clause must 'show that trial in the contractual forum will be so gravely difficult and inconvenient that he will for all practical purposes be **deprived of his day in court**.'"  *Stewart Org., Inc. v. Ricoh Corp.*, 810 F.2d 1066, 1070 (11th Cir. 1987) (*quoting Bremen*, 407 U.S. at 18) (emphasis added).

    In this case, Plaintiffs completely fail to carry their "heavy burden" of proving that they will be "deprived of [their] day in court" if their case is litigated in the Circuit Court of Cook County, Illinois.  In an attempt to show inconvenience, Plaintiffs merely state, in a conclusory fashion and without any evidentiary support, that: (1) "Plaintiffs and all class members are resident citizens of the State of Alabama," (2) "[t]he vast majority of witnesses are located in the State of Alabama," (3) "[t]he proceeds of the [underlying] lawsuits have been or will be paid in the State of Alabama," and (4) the "financial records relative to the [Plaintiffs' underlying] lawsuits are located in Alabama."  Pls.' Br. at 13.  Plaintiffs fail to identify with specificity the specific witnesses or "financial records" to which they are referring, fail to explain how these unidentified witnesses or "financial records" are relevant to their claims against Oasis, and, most importantly, fail to explain how the location of these unidentified witnesses and "financial records" will deprive them of their day in court.  Plaintiffs' conclusory statements, without any evidentiary support whatsoever, are simply insufficient to defeat the agreed upon forum-selection clause in the Purchase Agreements.  *See Smith v. Professional Claims, Inc.*, 19 F. Supp. 2d 1276, 1281 (M.D. Ala. 1998) (enforcing a forum-selection clause because "[the plaintiffs] have produced no evidence of the grave difficulty or inconvenience resulting from bringing suit in the contractual forum"); *Tisdale v. Shell Oil Co.*, 723 F. Supp. 653, 656 (M.D. Ala. 1987) (enforcing

forum-selection clause because "[the plaintiffs] have provided the court with no factual basis for their conclusory assertion that the costs of litigation in Saudi Arabia would be prohibitive").

Moreover, even if Plaintiffs had provided evidence to support their conclusory statements, they still would not meet their "heavy burden" of showing that the inconvenience would rise to such a level that they would be "deprived of [their] day in court."  *Stewart*, 810 F.2d 1066, 1070 (11th Cir. 1987) (*quoting Bremen*, 407 U.S. at 18)).  If Plaintiffs are required to re-file their claims in the Circuit Court of Cook County, Illinois (where they should have been filed in the first place), Plaintiffs' inconvenience will be minimal:

> This action has been filed as a putative class action.  Virtually all of the travel expenses and discovery expenses would be those of counsel in taking discovery of the defendants.  Virtually all of the paper discovery and deposition discovery will be of the defendants-not the plaintiff.  Moreover, it is standard practice that deposition of a plaintiff would be in her home city.  Thus, the only possible personal expense would be travel for [plaintiff] herself to actual trial--something that only a fraction of cases ever reach and something that would likely be years away.

*Barnes*, 397 B.R. at 154; *see also Woods v. Christensen Shipyards, Ltd.*, No. 04-61432, 2005 WL 5654643, *8 (S.D. Fla. Sept. 23, 2005) (finding that Washington state court is not an inconvenient forum for Florida residents and holding that "[w]ith the relative ease of modern travel, such concerns are substantially minimized and therefore do not rise to the level of inconvenience as set forth in *Bremen*").

Accordingly, Oasis's Motion to Dismiss for Improper Venue should be granted, and Plaintiffs' Motion for Summary Judgment should be denied as moot.

### B.  Alabama's Public Policy Regarding Gambling Is Irrelevant to Whether the Purchase Agreements' Forum-Selection Clause Should Be Enforced.

Plaintiffs argue that the Purchase Agreements' choice of law clause, which requires the Circuit Court of Cook County to apply Alabama law, somehow weighs against enforcement of

the Purchase Agreement's forum-selection clause.  *See* Pls.' Br. at 11-13.  The gist of Plaintiffs'

argument appears to be that it would be "unreasonable and illogical" for an out of state court to

interpret and apply Alabama's gambling statute because the statute, at least according to

Plaintiffs, involves "fundamental public policies."  *Id.* at 12.  Plaintiffs' argument fails because

the "public policy" prong referred to by the Supreme Court in *Bremen* and *Shute* is not

concerned with whether the underlying claims involve a state's public policy on a substantive

legal issue.  Rather, the public policy that is specifically of importance in applying the *Shute*

factors is whether Alabama has a public policy as set forth in its statutes or judicial opinions that

particular claims should be adjudicated in Alabama and nowhere else.  *Cf. Stewart Org., Inc. v.*

*Ricoh Corp.*, 810 F.2d 1066, 1069-70 (11th Cir. 1987) ("The Supreme Court of Alabama would

not seem to be concerned with the protection of the jurisdiction of the federal district courts

located in the state."); *see also Woods*, 2005 WL 5654643, *11.

In *Woods* the Southern District of Florida rejected an argument remarkably similar to the

argument made by Plaintiffs in this case:

> While there is a showing that the Florida legislature wanted to expand privacy
> protection and the damages available under those statutory protections, Plaintiffs
> do not cite either a Florida statute or judicial decision which sets forth the public
> policy regarding whether such claims must be adjudicated in Florida. The public
> policy that is specifically of importance in applying the [*Shute* factors is] whether
> Florida has a public policy as set forth in its statutes or judicial opinions that
> particular claims should be adjudicated in Florida. While the Florida courts and
> legislature have arguably set forth a policy regarding the protections that are to be
> afforded regarding invasion of privacy and the remedies available for violations
> thereof, neither a Florida court nor legislature has set forth a policy that said
> protections must be adjudicated in Florida. Therefore, in light of this absence, in
> the case at issue there is no Florida public policy that would preclude the
> enforcement of the forum-selection clause.

*Woods*, 2005 WL 5654643, *11.

As in *Woods*, in this case, Plaintiffs do not cite either an Alabama statute or judicial

decision which sets forth a public policy requiring that alleged violations of Alabama's gambling statute must be adjudicated in Alabama.  Plaintiffs' failure to cite such authority is not surprising because no Alabama court or legislature has set forth such a policy.  In light of this absence, there is no Alabama public policy that would preclude the enforcement of the forum-selection clause in the Purchase Agreements.

Accordingly, Oasis's Motion to Dismiss for Improper Venue should be granted, and Plaintiffs' Motion for Summary Judgment should be denied as moot.

**III.    Plaintiffs' Motion for Summary Judgment should be denied on the merits.**

Plaintiffs' Motion for Summary Judgment should be denied as moot because the overall validity of the Purchase Agreements is an issue that should be decided by the contractually agreed upon forum -- in this case, the Circuit Court of Cook County, Illinois.  On the off-chance that this Court reaches the merits of Plaintiffs' Motion for Summary Judgment, the Court should deny Plaintiffs' Motion.  Plaintiffs fail to provide any evidence whatsoever in support of their Motion, much less evidence substantial enough to meet their burden of proving the Purchase Agreements are void gambling contracts.  *See Osborn v. Pointer*, 128 So.2d 530, 531 (Ala. App. 1961) (the party asserting that a contract is void has the burden of proving the contract was based on gambling consideration); *Birmingham Trust & Savings Co. v. Curry*, 49 So. 319 (Ala. 1909) (same).  Moreover, Plaintiffs base their entire legal argument on a single decision from the Alabama Court of Civil Appeals with extreme facts that are easily distinguishable from this case, and ignore the last Alabama Supreme Court decision addressing (and upholding) legal funding agreements.

**A.    The unique facts and circumstances of *Wilson v. Harris*, 688 So.2d 256 (Ala. Civ. App. 1996).**

In *Wilson*, a jury had awarded Annie Harris ("Harris") $4 million in a wrongful death

lawsuit concerning the death of her daughter.  *Wilson v. Harris*, 688 So.2d 256, 266. (Ala. Civ. App. 1996).  After the jury award was entered and while the wrongful death case was on appeal, Harris asked her "friend" of twenty years, Willie George Wilson ("Wilson"), for a loan.  *Id.* "Without consulting her attorneys in the lawsuit," Harris signed an agreement (the "Wilson-Harris Agreement") whereby she agreed to transfer and assign to Wilson a one-third (1/3) percentage of any money collected in the wrongful death lawsuit.  *Id.* at 267.  In exchange, Wilson advanced funds to Harris in the amount of $4,749.00.  *Id.* at 268.  Harris, a high school dropout, signed the Wilson-Harris Agreement only after Wilson's attorney "explained" the terms to her.  *Id.* at 267.  Harris later testified that she did not understand the terms of the Wilson-Harris Agreement, and believed she would only have to pay Wilson "some extra money and the interest."  *Id.* at 267-68.  Harris ultimately recovered approximately $2.5 million from her wrongful death suit.  *Id.* at 268-69.  Wilson claimed he was entitled to his one-third percentage interest, or $833,000.00, which is approximately one hundred seventy five (175) times the amount of Wilson's $4,749.00 advance to Harris.  *Id.*

The *Wilson* Court found the Wilson-Harris Agreement void based on an unspecified combination of Alabama's gambling statute (Ala. Code § 8-1-50) and common law champerty. *Id.* at 270.  The *Wilson* Court first noted that the agreement between Harris and Wilson was a "wager" under Alabama Code § 8-1-150 because there was a clear "gainer" (Wilson) and a clear "loser" (Harris) under the agreement.  *Id.* at 269-70.  The *Wilson* Court explained that "[w]e doubt that Harris would consider herself a 'gainer' if she were required to give Wilson $833,000 in exchange for the $4749 advanced to her."  *Id.* at 270.

With respect to champerty, the *Wilson* Court relied on an out of context passage from *Lott v. Kees*, 165 So. 2d 106 (Ala. 1964):

> The doctrine of champerty is directed against speculation in lawsuits and to repress the gambling propensity of buying up doubtful claims . . . .  [A]greements should be carefully watched and closely scrutinized, when called in question, and if found to have been made . . . for the purpose of gambling in litigation, or to be so extortionate or unconscionable as to be inequitable against the party, effect ought not be given to them.

*Id.* at 270 (*quoting Lott*, 165 So. 2d at 110).  The *Wilson* Court then held that "[t]he general tendency of the Wilson-Harris Agreement is opposed to the public interest because it condones speculation in litigation, makes sport of the judicial process, and tempts the unscrupulous to prey upon the distress of the ignorant and unfortunate." *Wilson*, 688 So.2d at 270.

As discussed below, Wilson is distinguishable from this case because, in this case, Plaintiffs failed to present any evidence whatsoever in support of their claims, let alone evidence that Oasis engaged in "speculation in litigation," "[made] sport of the judicial process," and "tempt[ed] the unscrupulous to prey upon the distress of the ignorant and unfortunate," which is the obvious basis of the *Wilson* decision resulting from the extreme and unique facts in that case.

**B.      Unlike *Wilson*, this case does not involve gambling or champerty, but rather involves a *bona fide* transaction that is condoned across the country.**

**1.      The Purchase Agreements are the result of *bona fide* business transactions.**

Alabama Code Section 8-1-150 provides that "[a]ll contracts founded in whole or in part on gambling consideration are void."  Section 8-1-150 does not define "gambling."  However, the Alabama criminal code provides that "[g]ambling does not include *bona fide* business transactions valid under the law of contracts . . ."  Ala. Code § 13A-12-20.  In addition, the Alabama Supreme Court recognized that legal funding agreements could be considered *bona fide* business transactions.  *Lott v. Kees*, 165 So. 2d 106, 110 (Ala. 1964) ("Courts administering justice according to the broad principles of equity and good conscience, as they are bound to do, will consider whether the transaction is merely the *bona fide* acquisition of an interest in the

16

subject of litigation, or whether it is an unfair or illegitimate transaction gotten up for the purpose merely of spoil or speculation.")  Unlike the facts in *Wilson*, the evidence presented in this case at least raises issues of fact regarding whether the Purchase Agreements were the result of *bona fide* business transactions.

The evidence submitted by Oasis shows that the Purchase Agreements involved *bona fide* business transactions.  As demonstrated by the affidavits of Michael Pekin, non-recourse legal funding is a legitimate business that is accepted across the country.  Supp. Pekin Aff., ¶¶ 3-5.  At least fifty companies other than Oasis are operating legal funding businesses across the country. *Id.*, 3.  Oasis, along with fourteen other companies engaged in non-recourse legal funding, is a member of the American Legal Finance Association ("ALFA").  *Id.*, ¶ 5.  One of ALFA's main purposes was, and is, to establish and maintain the highest ethical standards and fair business practices within the legal funding industry.  *Id.*  To this end, ALFA established a list of Industry Best Practices that all of its members, including Oasis, agreed to follow.  *Id.*  Oasis is currently engaged in the business of legal funding in 48 states.  *Id.*, ¶ 3.  At the time this action was filed, at least four other companies provided legal funding in the State of Alabama.  *Id.*, 4; *see also* Compl. ¶¶ 9-12.  The benefits of non-recourse legal funding agreements akin to the Purchase Agreements at issue in this case have been expressly recognized in other states as legitimate business transactions.  *See, e.g.,* Ohio Rev. Code Ann. §1349.55; Me. Rev. Stat. Ann. tit. 9-A, § 12-101 *et seq.*  These facts, which demonstrate the legitimate nature of the non-recourse legal funding industry, were not considered or discussed by the *Wilson* Court.

Moreover, the terms of, and the circumstances surrounding the signing of, the Purchase Agreements show that the Purchase Agreements were the result of *bona fide* business transactions and are far different from the troublesome terms and over-bearing, unique

17

circumstances surrounding the signing of the Wilson-Harris Agreement in *Wilson*. The relevant

facts of *Wilson* are:

- Harris signed an agreement transferring one-third of the proceeds of a lawsuit in which a jury had already awarded her $4 million. *Wilson*, So. 2d at 266.

- Prior to signing the agreement, Harris advised Wilson, her friend of twenty-years, that she was in "great financial need." *Id.* at 266-67.

- Harris signed the agreement "in the law office of Wilson's attorney." *Id.* at 267.

- Harris signed the agreement "[w]ithout consulting her attorneys in the lawsuit." *Id.*

- Harris, a high school dropout, signed the agreement only after Wilson's own attorney "explained" the agreement to her. *Id.*

- Harris testified that she did not understand the terms of the agreement, and believed she would only have to pay Wilson "some extra money and the interest." *Id.* at 267-68.

- Wilson paid Harris $4,749.00 and was due to receive $833,000 (approximately 175 times his initial advance).[7]

Unlike *Wilson*, in this case Rucker, Anderson, and Prince were all separately represented

by counsel at the time they signed the Purchase Agreements, and their attorneys each signed

separate "Attorney Acknowledgement" forms Pekin Aff., ¶¶ 4-6 & Ex. A, B & C, thereto.

Notably, in *Wilson*, Wilson's attorney "explained" the terms of the Wilson-Harris Agreement to

Harris. In contrast, in this case, Plaintiffs' respective attorneys each had the opportunity to

review the Purchase Agreement with his or her client. Unlike *Wilson*, where Wilson advanced a

small sum of money in return for a large (1/3) **percentage** of the proceeds of Harris's lawsuit,

Oasis is merely entitled to repayment of the amount it originally funded plus an additional sum

that gradually increases over time based on an agreed upon payment schedule. Notably, Wilson

was due to receive 175 times the amount of his initial advance due to the fact that the Wilson-

---

[7] In comparison, Oasis funded Anderson $3000.00 and received only $4,058.96 from Anderson as payment in full more than a year later. Supp. Pekin Aff., ¶ 7

Harris Agreement was based on a percentage.  Plaintiffs have offered no evidence whatsoever, let alone evidence showing that the factual circumstances in this case are anything like the suspect factual circumstances in *Wilson*.  Thus, unlike in *Wilson*, Plaintiffs in this case have failed to provide any evidence that Oasis was engaged in "speculation in litigation," "mak[ing] sport of the judicial process," or "tempting the unscrupulous to prey upon the distress of the ignorant and unfortunate."  *Wilson*, So.2d at 270.

At a minimum, there are genuine issues of material fact regarding whether the Purchase Agreements in this case were the result of the *bona fide* business transactions.  Accordingly, Plaintiffs' Motion for Summary Judgment should be denied.

> **2.     The Purchase Agreements are not champertous or against public policy.**

The last time the Alabama Supreme Court ever expressed any opinions on champerty, it upheld an agreement involving legal funding.  *Lott v. Kees*, 165 So. 2d 106 (Ala. 1964).  In *Lott*, destitute landowners entered into an agreement with oil speculators, whereby the oil speculators agreed to fund litigation for the landowners to clear title to certain property and, in return, the landowners agreed to grant the oil speculators a mineral lease for the property.  *Id.* at 106-07. The leases provided that the oil speculators would receive 7/8 of an interest in any oil located beneath the property, while the landowners would receive merely 1/8 of an interest in such oil. *Id.*  After obtaining the leases, the oil speculators initiated successful exploratory drilling for oil. *Id.*

The *Lott* Court expressed the following views on legal funding agreements:

[T]he purchase of a right which is the subject matter of a pending lawsuit by one standing in no fiduciary relationship, is ***not unlawful***, unless it is made for the mere ***purpose or desire of perpetrating strife and litigation***. . . .  A fair *bona fide* agreement, by a layman, to supply funds to carry on a pending suit, in consideration of having a share in the property if recovered, it seems to us, ought

> ***not to be regarded as per se void***, either on the grounds of ***champerty***, as now understood or of ***public policy***. . . .   The doctrine of champerty is directed against speculation in lawsuits, and to repress the gambling propensity of buying up doubtful claims.  It is not, nor never was intended to prevent persons from charging [sic] the subject matter of the suit in order to obtain the means of prosecuting it.

*Id.* at 110 (emphasis added).  The *Lott* Court advised that courts considering legal funding agreements should determine "whether the transaction is merely the *bona fide* acquisition of an interest in the subject of litigation, or whether it is an unfair or illegitimate transaction gotten up for the purpose merely of spoil or speculation." *Id.* at 110.[8]  The *Lott* Court upheld the validity of the legal funding agreement between the landowners and oil speculators because "the parties entered into the transaction in good faith, and with no intention on the part of [the oil speculators] of officious intermeddling in a controversy or with the desire to promote or foster unnecessary litigation." *Id.* at 111.  The *Lott* Court held that "[i]n view of the fairness of the transaction and the need of the [the landowners] for immediate financial help in trying to retrieve their otherwise lost property, we do not think the advancement of financial help violated ***any*** principle of law or ***public policy***." *Id.* (emphasis added).

As in *Lott*, each Purchase Agreement at it issue in this case was entered into in good faith with no intention on the part of Oasis to promote or foster unnecessary litigation.  Indeed, it is evident that Plaintiffs' respective personal injury claims were moving forward regardless of whether Oasis provided any funding because each Plaintiff independently hired an attorney prior to seeking any funding from Oasis.  Supp. Pekin Aff., ¶ 10.  Further, each of the Purchase Agreements expressly provides that "Purchaser [Oasis] has imposed no conditions on Seller's [Rucker's, Anderson's, or Prince's] use of the Purchase Price."  Purchase Agreements, ¶ 3.3.

---

[8] Although the *Wilson* Court cites to *Lott*, it quotes only an incomplete and out of context passage from *Lott*.  *Wilson*, 688 So.2d at 270 (*quoting Lott*, 165 So. 2d at 110).

Oasis fully complied with Paragraph 3.3 and did not impose any conditions on either Rucker's, Anderson's, or Prince's, use of the Purchase Price.  Supp. Pekin Aff., ¶ 8.  Further still, each of the Purchase Agreements also expressly provides:

> Purchaser [Oasis] acknowledges and agrees that Purchaser shall have no right to and will not make any decisions with respect to the conduct of the Legal Claim or any settlement or resolution thereof and that the right to make such decisions remains solely with Seller [Rucker, Anderson, or Prince] and Seller's Attorney.

Purchase Agreements, ¶ 4.1.  Oasis fully complied with this provision and never interfered in any manner with Plaintiffs' lawsuits.  Supp. Pekin Aff., ¶ 9.  As in *Lott*, the "advancement of financial help" to Plaintiffs does not violate "***any*** principle of law or public policy."  *Lott*, 165 So.2d at 111 (emphasis added).

Accordingly, the Purchase Agreements are not champertous and do not violate public policy, and Plaintiffs' Motion for Summary Judgment should be denied.

### 3.     The Purchase Agreements are not gambling contracts because the parties are not taking opposites sides of an uncertain event.

The Purchase Agreements are not gambling contracts because, regardless of the outcome of Plaintiffs' personal injury cases, both parties will either be gainers or both parties will be losers.  Gambling contracts are defined as "contracts between two or more persons, whereby they agree to risk their money or property upon contingency or chance . . . whereby the ***one party will be the gainer, and the other as loser***."  *State v. Stripling*, 21 So. 409, 410 (Ala. 1897) (emphasis added); *see also* 38 C.J.S. Gaming § 5 ("There is also authority that 'gaming' or 'gambling' involve the risk of money, between two or more persons, on a contest of chance, where **one must be a loser and the other a gainer**.") (emphasis added).  Similarly, "[a] wager is nothing more than a bet, 'by which two parties agree that a certain sum of money, or other thing should be paid or delivered to ***one*** of them on the happening of an uncertain event.'"  *Thornhill v. O'Rear*, 19

So. 382, 383 (1896) (emphasis added).[9]  Under the Purchase Agreements, both Plaintiffs and

Oasis desire the same outcome -- that Plaintiffs prevail on their personal injury claims.  Thus,

both parties to the Purchase Agreements stand to be "gainers" if the Plaintiffs' recover damages

in their personal injury cases, and both parties to the Purchase Agreements stand to be "losers" if

the Plaintiffs fail to recover damages in their personal injury cases.

The *Wilson* Court found that Harris would not be a "gainer" only because the Wilson-

Harris Agreement required Harris to give Wilson 175 times the amount of the initial advance.

*Wilson*, 688 So.2d at 269 ("We doubt that Harris would consider herself a 'gainer' if she were

required to give Wilson $833,000 in exchange or the $4749 advanced to her.")  In contrast, the

most Oasis can receive is less than two and half times the amount of the initial funding, and that

would happen only if the legal claim takes two and a half years or longer to resolve.

Accordingly, the Purchase Agreements are not wagers or gambling contracts, and

Plaintiffs' Motion for Summary Judgment should be denied.

> **4.      The Purchase Agreements are not gambling contracts because each
> Plaintiff has an independent interest in the outcome of his or her
> respective personal injury case.**

"[A] wager is defined as a contract in which the parties stipulate that they shall gain or

lose upon the happening of an uncertain event in which ***they have no interest*** except that arising

from the possibility of such gain or loss."  *Grooms v. Knox*, 142 So.2d 583, 584 (Ala. 1932)

(quotations omitted; emphasis added); *see also* 38 Am. Jur. 2d *Gambling* § 3.  Under this

definition, neither party to the contract can have any interest in the uncertain event.  For

example, when two people bet on a horserace, neither person has any interest in the outcome of

---

[9] The terms "wager" and "gambling" are generally viewed as synonymous.  *See, e.g., McDonald v. Bryant*, 381 S.W.2d 736, 738 (Ark.1964) ("The words, 'wagering,' 'betting,' and 'gambling,' are practically synonymous, and the terms are so used in common parlance, in dictionary and legal definitions, and in statutory and constitutional enactments.")

the race independent of winning or losing the bet.  In contrast, in this case, each of the Plaintiffs

maintains a personal interest in the outcome of his or her respective personal injury case separate

and independent from his or her rights and obligations under the Purchase Agreement with

Oasis.  The outcome of each Plaintiff's personal injury case will not only define his or her

obligations and rights under the Purchase Agreements with Oasis, but will also define his or

rights with respect to the parties he or she is suing.  Thus, the Purchase Agreements do not meet

the definition of a "wager."

Accordingly, the Purchase Agreements are not wagers or gambling contracts, and

Plaintiffs' Motion for Summary Judgment should be denied.

> **5.    The Purchase Agreements are not gambling contracts because the
> Oasis Ownership Amount is not contingent upon an uncertain or
> contingent event.**

Alabama Code Section 8-1-150 provides that "[a]ll contracts founded in whole or in part

on gambling consideration are void" and also provides that "[a]ny person who has paid any

money or delivered any thing of value lost upon any game or wager may recover such money,

thing, or its value . . ."  Section 8-1-150 does not define "gambling" and does not define

"wager."  However, the Alabama criminal code defines "gambling" as follows:

> A person engages in gambling if he stakes or risks something of value upon the
> outcome of a contest of chance or future contingent event not under his control or
> influence, upon an agreement or understanding that he or someone else will receive
> something of value in the event of a certain outcome.  Gambling does not include
> *bona fide* business transactions under the law of contracts . . .

Ala. Code § 13A-12-20(4).  Similarly, Alabama courts have historically defined a "wager" as

follows:  "A wager is nothing more than a bet, 'by which two parties agree that a certain sum of

money, or other thing should be paid or delivered to one of them on the happening of an

uncertain event.'"  *Thornhill v. O'Rear*, 19 So. 382, 383 (Ala. 1896).  The definitions of

"gambling" and "wager" require an uncertain or contingent event.

In *Wilson*, the Court found that the Wilson-Harris Agreement was gambling because it was based "upon the happening of an **uncertain event** over which neither party had control-- Harris's recovery of damages after her personal injury suit survived the appellate process." *Wilson*, 688 So.2d at 268 (emphasis added).  However, in that case, Wilson, unlike Oasis in this case, advanced a small sum of money in return for a large **percentage** (1/3) of the proceeds of Harris's lawsuit, equaling $833,000.00.  Because Wilson purchased a percentage of the proceeds of Harris's lawsuit, the dollar amount of Wilson's interest was entirely contingent upon the amount Harris recovered.  In other words, Wilson was betting on a high recovery.  In contrast, Oasis did not advance a small sum of money in exchange for a large percentage of Plaintiffs' potential recovery.  Rather, under the terms of the Purchase Agreements, Oasis is merely entitled to the Oasis Ownership Amount, which includes the Purchase Price (the original funding amount), plus an additional sum that gradually increases over time based on an agreed upon payment schedule.  Purchase Agreements, ¶ 1.2.  Thus, unlike Wilson, the amount of money Oasis receives is based merely on the passage of time, and not on the amount the Plaintiffs may or may not recover.  The passage of time is not an uncertain or contingent event.

> **6.    A holding that litigation alone is considered a contingent event for purposes of gambling would lead to absurd results, including the end of contingent fee agreements and "high-low" agreements.**

To hold that the outcome of litigation alone is considered a contingent event for purposes of gambling would lead to absurd results.  Indeed, if Plaintiffs' position were to prevail, litigants would be precluded from entering into contingent fee agreements with their attorneys or "high-low" settlement agreements whereby the parties hedge their bets as to potential jury verdicts. *See, e.g., Gisbrecht v. Barnhart*, 535 U.S. 789, 810 (2002) (J. Scalia, dissenting) ("For it is in the

nature of a contingent-fee agreement to *gamble* on outcome and hours of work-assigning the risk of an unsuccessful outcome to the attorney, in exchange for a percentage of the recovery from a successful outcome that will (because of the risk of loss the attorney has borne) be higher, and perhaps much higher, than what the attorney would receive in hourly billing for the same case.") *Smalbein v. City of Daytona Beach*, 353 F.3d 901, 911 (11th Cir. 2003) ("High-low settlement agreements, which leave the merits of a case for trial but bracket the parties' risk of litigation, are not unusual.")

Accordingly, the Purchase Agreements are not wagers or gambling contracts, and Plaintiffs' Motion for Summary Judgment should be denied.

### Conclusion

For the foregoing reasons, all of the claims against Oasis should be dismissed, pursuant to Rule 12(b)(3), without prejudice, and Plaintiffs' Motion for Summary Judgment should be denied as moot.  Alternatively, if the Court reaches the merits of Plaintiffs' Motion for Summary Judgment, the Plaintiffs' Motion for Summary Judgment should be denied on the merits.

_____/s/ Lana A. Olson_____
Counsel for Oasis Legal Finance, LLC

OF COUNSEL:

Sara Anne Ford (FORDS5509)
*sford@lightfootlaw.com*
Lana Alcorn Olson (ALCOL6841)
*lolson@lightfootlaw.com*
Lightfoot, Franklin & White LLC
400 N. 20th Street
Birmingham, AL 35203-3200

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 18th day of June 2009, I electronically filed the foregoing with the Clerk of Court using the EM/ECF system, which will automatically send email notification to the following attorneys of record:

Samuel M. Hill
Brian D. Turner, Jr.
Hill Turner, LLC
2117 Magnolia Avenue
Suite 100
Birmingham, AL 35205

James H. McFerrin
The McFerrin Law Firm
2117 Magnolia Avenue
Suite 100
Birmingham, AL 35205

R. Bruce Barze, Jr.
Daniel E. Harrell
Balch & Bingham LLP
Post Office Box 306
Birmingham, AL 35201-0306

_____/s/ Lana A. Olson_____
Of Counsel